**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

          **v.**               **10-CR-0352A(Sr)**

**BRION WARRICK,**

          **Defendant.**
_____

## REPORT, RECOMMENDATION AND ORDER

       This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

       The defendant, Brion Warrick ("the defendant"), is charged in an indictment with possession of four (4) Smith & Wesson .32 caliber cartridges in violation of Title 18, United States Code, Sections 922 (g)(1) and 924 (a)(2). (Dkt. # 1). He   has filed a motion to suppress "tangible evidence" and statements as part of a pretrial omnibus motion.(Dkt. #20).  The government filed a response to the defendant's motion to suppress wherein it asserts that defendant's motion to suppress tangible evidence should be denied since he "fails to make an evidentiary showing of his standing to assert a Fourth Amendment interest in the vehicle from which a gun and ammunition were seized and in those items" but admitted that an evidentiary hearing was necessary

on defendant's motion to suppress his alleged statements.  (Dkt. #24, pp. 18, 24).  The

government further asserted an alternative position as to defendant's motion to

suppress the tangible evidence seized from the automobile in which he was a

passenger, to wit, "the Court will have a more than adequate basis to find that the gun

and ammunition would have been inevitably discovered and seized during a properly

limited protective sweep of the vehicle in which they were found."  (Dkt. #24, p. 20).


        An evidentiary hearing on the issues of the seizure of the "tangible

evidence" and the obtaining of statements from the defendant by the arresting police

officers was held by this Court on April 26 and May 2, 2011. The Government called

Buffalo Police Officers Dennis Gilbert, Lt. Paul Mullen and Derrick Fuller as witnesses.

The defendant did not present any direct evidence. Transcripts of the proceedings were

filed on June 24, 2011.  (Dkt. #26, Vol. I, April 26, 2011 proceeding); (Docket #27, Vol.

II, May 2, 2011 proceeding).  Thereafter, post-hearing memoranda were filed by the

government (Dkt. #30) and the defendant (Dkt. #31) on August 18 and August 29,

2011, respectively.  As authorized by this Court, the government filed a reply to

defendant's memorandum of law (Dkt. #31) on September 1, 2011 (Dkt. #33).

# FACTS[1]

Buffalo Police Officer Dennis Gilbert testified that in the early morning hours of August 28, 2010, while off duty from the Buffalo Police Department, he received a telephone call on his personal cell phone from a confidential informant that he had known for approximately three years.  (T1, pp. 6-9).  He considered this confidential informant to be reliable "because there [was] a track record that warrant[ed] the reliability" and "because the source that gave [him] the information had nothing to gain, was not working off a charge, was not being paid, was not receiving a benefit."  (T1, p. 12).  The informant told him "that there was an altercation on Poultney Street in the City of Buffalo; that there were multiple people involved; and that a young black male had just put a handgun into a mini van."  (T1, p. 13).  It was his opinion, based on the phone conversation, that the confidential informant "had actually witnessed that person allegedly put the gun in the mini van."  (T1, p. 13).  Upon completion of the call with the informant, Officer Gilbert, who was assigned to C District of the Buffalo Police Department ("BPD"), immediately  "called the C District stationhouse" and "spoke with Lt. Wilcox" and "gave him the information" that he had just received from the confidential informant.  He told Lt. Wilcox "that the information [he received from the informant] was always good."  He did this "because there was (sic) multiple people

---

[1] The facts herein are taken from the testimony and exhibits admitted into evidence in the proceedings held on April 26 and May 2, 2011.  References to those proceedings will be designated as T1, hearing on April 26, 2011, and T2, hearing held on May 2, 2011, transcript volumes I and II, respectively, followed by the appropriate page number(s).

involved; because it involved a handgun; and the information that [he] had received prior from this source was - - [he] never had an instance to doubt his or her credibility." Officer Gilbert was also of the opinion "that the source or informant had actually witnessed the altercation" and that the informant's call to him had been made "close in time to the events . . . witnessed."  Officer Gilbert further testified that as he "spoke to the source on the phone, it [the altercation] was definitely still going on and the responsible parties involved were still there."  (T1, pp. 14-15).[2]  Officer Gilbert's belief in this regard was based on "the excitement in the source's voice, the rate at which the source was speaking.  There was some urgency in it.  "There was (sic) obvious observations that were made when the source was talking to [him].  The source wasn't talking in the past tense."  The source told him that he "saw a young black male put a gun in a mini van."  (T1, pp. 22-23).

Lt. Paul Mullen of the Buffalo Police Department testified that while in his E District police stationhouse on August 28, 2010, he and other police officers heard a police radio call "from another lieutenant in a different district that there was information from an informant that there was a vehicle at 75 Poultney in which there was a weapon in the vehicle."  (T1, pp. 43-44, 67, 69-70; T2, pp.110-111).  Seventy-Five Poultney is located in E District.  (T1, p. 43).

---

[2] Approximately ten minutes after his call to Lt. Wilcox, Lt. Wilcox called Officer Gilbert and advised him that a handgun had been recovered from a minivan and that some people had been taken into custody.

-4-

Government Exhibit 1, a computer aided dispatch ("CAD") printout, establishes that Lt. Wilcox of C District, identified on the CAD as "C552," initiated a police radio call at 1:32:30 a.m. on August 28, 2010 wherein he reported a "tan Caravan or Transport" with "4 black males" and possibly a "handgun in the car" based on information received from an informant.[3]

Upon hearing this radio communication from Lt. Wilcox, Lt. Mullen "started heading over to 75 Poultney" (T1, p. 51), and three other police officers responded from his stationhouse as well (T2, pp. 110-112), with all arriving at the location "within seconds of each other". (T1, pp. 53, 67). It took Lt. Mullen approximately "three to six minutes" to arrive at 75 Poultney. (T1, p. 54). He "initially drove by the vehicle [in question], which was parked in front of 75 Poultney on [his] right-hand side" and he saw "two people sitting in the front seat of the vehicle" and "there appeared to be other people sitting in the back, but because of the tinted windows, it was difficult to tell exactly how many people were in the back, but [he] could clearly see two people sitting in the front seat." (T1, pp. 54, 80). He then turned his vehicle around and parked it as did three other police vehicles that had arrived at the scene. A total of five police officers were now on the scene and they "exited [their] patrol vehicles, and walked up to the van" that fit the description" given in the radio call (Government Exhibits 1 and 2)

---

[3] The government submitted a CD containing the radio transmissions between the police radio dispatcher and various police officers in C District and E District on August 28, 2010 regarding the matter at 75 Poultney which was received into evidence as Government Exhibit 2. This Court has listened to those transmissions and they corroborate the testimony of Lt. Paul Mullen in this regard.

and at that point initiated contact with the people inside the vehicle."  (T1, pp. 54-55; T2, p.100).  Lt. Mullen remained "a couple feet behind the patrol officers who were handling the call."  It was determined that there were three occupants in the vehicle; a black female who was in the driver's seat and two black males, one of whom was in the front passenger seat and the other in the rear seat. (T2, p.109).

Patrol Officers Fuller and Heitzhaus "went over to the passenger's side of the vehicle, the tan vehicle that fit the description" and Officer Fuller began "to talk with the passenger in the front seat" later identified as the defendant.  Officer Fuller asked the defendant "if there was any drugs or weapons in the vehicle" and the defendant said "no."  Officer Fuller then asked if "it would be all right if [they] checked" and the defendant stated "it wasn't his vehicle but he would have no problem;" the defendant stated the vehicle was his girlfriend's and indicated the female driver in the van. The other police officers were engaged with the female driver/owner of the van obtaining her consent to search the van. When these officers indicated that the consent to search the van had been given by the driver/owner,Officer Fuller opened the front passenger door and the defendant was asked to step out of the vehicle which he did. He was then "pulled towards the back of the vehicle" for "security purposes".  As soon as this was done, Officer Heitzhaus stated "we got a gun recovered."  Officer Fuller then "patted down" the defendant after being placed in handcuffs.  The defendant was then placed in the back seat of the patrol car.  (T2, pp. 100-102, 116-117, 121-127).

After the defendant had been handcuffed and placed in a patrol car, Lt. Mullen went to the front seat area of the tan vehicle and observed "a small revolver with a black, plastic handle sticking out from underneath the front seat."  (T1, pp. 58, 79). Thereupon, Lt. Mullen went to the patrol car where the defendant had been placed and "initially advised [the defendant] of his Miranda warnings prior to asking him any questions."  (T1, p. 58).  Officer Fuller was present when these warnings were given to the defendant.  (T1, p. 59; T2 p. 94, 103).  Lt. Mullen asked the defendant if he understood his rights and the defendant replied that he did.  (T1, pp. 60-61; T2, p. 98). Lt. Mullen then asked the defendant "whose gun was it" and the defendant replied "the dude in the back seat.  We heard a clunk.  We wasn't thinking it was a gun." (T1, p. 64).  Officer Fuller, who was present along side of Lt. Mullen, then asked the defendant "whose gun was in the vehicle" and the defendant stated "that he didn't know there was a gun in the vehicle but if there was, it was the young guy that they picked up over here."  (T2, p. 100).  Officer Fuller asked the defendant "why was the gun in the front of the car - - in the front seat, under the front seat."  The defendant responded saying "the young guy must have pushed it up front."  Officer Fuller further testified that the defendant told him that "he heard a pop" and that "the [young] guy was acting kind of fidgety" and "almost cracked her window when he threw the gun."  (T2, p. 103; Government Exhibit 3).  Officer Fuller completed a New York Criminal Procedure Form 710.30 ("CPL 710.30") setting forth the alleged statements of the defendant. (Government Exhibit 3).  Officer Heitzhaus removed the gun from the vehicle and unloaded it.  (T2, pp. 130-131).

Ultimately, Officers Fuller and Heitzhaus drove the defendant to police headquarters where he was booked.  (T2, p. 104).

## DISCUSSION AND ANALYSIS

It is undisputed that there was no arrest warrant for the arrest of the defendant and no search warrant for the search of the vehicle in which the defendant was a passenger when the police officers undertook their action on August 28, 2010. The defendant argues that "the prosecution has failed to establish any lawful basis for the search or seizure of either the defendant or the car."  (Docket #31, p. 8).  He further asserts that "because the defendant's statements were solely the result of the unlawful search and seizure in this matter, they constitute fruit of the poisonous tree and must be suppressed." (Dkt. #31, p. 11).  In response, the government argues that the "defendant was not 'seized' under the Fourth Amendment and does not have standing to challenge the approach of the vehicle."  (Dkt. #30, p. 6).  Further, the government asserts that "the officers had reasonable suspicion to conduct a 'pat down' search of the vehicle."  (Dkt. #30, p. 9).  Lastly, the government claims that since "the owner of the vehicle gave consent to law enforcement to search her vehicle," the defendant "does not have standing to challenge the search of the vehicle."  (Dkt. #30, p. 14).

The government's contention that the defendant lacks "standing to assert a Fourth Amendment interest in the vehicle from which the gun and ammunition were seized and in those items" (Dkt. #24, p. 18) is without legal merit.  It is undisputed that the defendant was an occupant of the tan minivan in question when the police officers

detained it on August 28, 2010.  The United States Supreme Court has expressly held

that "stopping a car and detaining its occupants constitute a seizure."  *Brendlin v.*

*California*, 551 U.S. 249, 256 (2007) citing *United States v. Hensley*, 469 U.S. 221, 226

(1985).  As a result, a passenger in a detained vehicle has standing for purposes of

asserting Fourth Amendment rights.  The fact that the tan van in question was parked

when the police first approached it is of no legal consequence.  It was their actions of

detaining the vehicle for purposes of conducting their investigation that constituted a

"seizure" not only of the vehicle, but all of its occupants as well.  *Brendlin, supra* at 255-

256.  As a result, the defendant does have standing to challenge the actions of the

police officer as being violative of his constitutional rights.  *Brendlin, supra* at 251.


          The information provided by the confidential informant to Buffalo Police

Officer Gilbert and then passed on by him to Lt. Wilcox provided a legally sufficient

basis for the police to conduct an investigation and effectuate a *Terry* stop of the tan

minivan located on Poultney Street.  Officer Gilbert testified that this confidential

informant was someone known to him by name and a person he had known for

approximately three years who had proven to be reliable in the past.  (T1, pp. 6-9; 12).

Officer Gilbert testified that his informant "had actually witnessed that person allegedly

put the gun in the mini van" (T1, p. 13) and that "the excitement in the source's voice,

the rate at which the source was speaking, ... the urgency in it, obvious observations

that were made when the source was talking to [him] "and the fact that the "source

wasn't talking in the past tense" (T1, pp. 22-23) caused him to believe that the

altercation "was definitely still going on and the responsible parties involved were still

there."  (T1, pp. 14-15).  As a result, Officer Gilbert "acted justifiably in responding to his

informant's tip" by forwarding this information to Lt. Wilcox, his superior at C District.

(T1, pp. 14-15).  *Adams v. Williams*, 407 U.S. 143, 146-147 (1972); *United States v.*

*Elmore*, 482 F.3d 172, 181 (2d Cir. 2007) ("where the informant is known from past

practice to be reliable, as in *Williams*, no corroboration will be required to support

reasonable suspicion.").  Lt. Wilcox then transmitted the information received from

Officer Gilbert over the Buffalo Police Department radio communication system.

(Government Exhibits 1 and 2).  This information, as transmitted by Lt. Wilcox, was

heard by Lt. Mullen and Officer Fuller of E District where 75 Poultney was located.  (T1,

pp. 43-44).  It was legally proper for Lt. Mullen and his officers from E District to

undertake an investigation at 75 Poultney based on the information transmitted by Lt.

Wilcox.

> Under the collective or imputed knowledge doctrine, an
> arrest or search is permissible where the actual arresting
> or searching officer lacks the specific information to form
> the basis for probable cause or reasonable suspicion but
> sufficient information to justify the arrest or search was
> known by other law enforcement officials initiating or involved
> with the investigation.  See United States v. Hensley, 469 U.S.
> 221, 230-33, 105 S. Ct., 675,83 L.Ed.2d 604 (1985); United States
> v. Canieso, 470 F.2d 1224, 1230 n. 7 (2d Cir. 1972).  "The rule
> exists because, in light of the complexity of modern police work,
> the arresting officer cannot always be aware of every aspect
> of an investigation; sometimes his authority to arrest a suspect
> is based on facts known only to his superiors or associates."
> United States v. Valez, 796 F.2d 24, 28 (2d Cir.1986).

*United States* v. *Colon*, 250 F.3d.130, 135 (2d. Cir. 2001); Panetta v. Crowley, 460 F3d.

388,395 (2d Cir.2006).

In a matter of "three to six minutes" after hearing the radio transmission by Lt. Wilcox, Lt. Mullen and Officer Fuller observed a tan van parked in front of 75 Poultney with a number of occupants sitting inside it.  (T1, p. 54).  This observation, coupled with the information received from Lt. Wilcox, certainly provided reasonable suspicion that criminal activity may be afoot involving the occupants of the tan minivan thus justifying the actions of the police officers in approaching the van and questioning its occupants under the principles enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968).

The decision of the United States Supreme Court in *United States v. Arvizu*, 534 U.S. 266 (2002), reiterates and summarizes the principles established in *Terry* and its progeny as follows:

> The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  *Terry v. Ohio*, 392 US 1, 9, 20 L Ed 2d 889, 88 S Ct 1868 (1968); *United States v. Cortez*, 449 US 411, 417, 66 L Ed 2d 621, 101 S Ct 690 (1981).  Because the "balance between the public interest and the individual's right to personal security," *United States v. Brignoni-Ponce*, 422 US 873, 878, 45 L Ed 2d 607, 95 S Ct 2574 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "'may be afoot,'" *United States v. Sokolow*, 490 US 1, 7, 104 L Ed 2d 1, 109 S Ct 1581 (1989) (quoting *Terry, supra*, at 30, 20 L Ed 2d 889, 88 S Ct 1868).  See also *Cortez*, 449 U.S., at 417, 66 L Ed 2d 621, 101 S Ct 690 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  See, *e.g., id.,* at 417-418, 66 L Ed 2d 621, 101 S Ct 690.  This process allows officers to draw on their own experience and specialized training to make inferences from the deductions about the cumulative information available to them that "might well elude an untrained person."  *Id*., at 418, 66 L Ed 2d 621, 101 S Ct 690.  See also *Ornelas v. United States*, 517 US 690, 699, 134 L Ed 2d 911, 116 S Ct 1657 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers).  Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, *Terry, supra*, at 27, 20 L Ed 2d 889, 88 S Ct 1868, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow, supra*, at 7, 104 L Ed 2d 1, 109 S Ct 1581.

Our cases have recognized that the concept of reasonable suspicion is somewhat abstract.  *Ornelas, supra*, at 696, 134 L Ed 2d 911, 116 S Ct 1657 (principle of reasonable suspicion is not a "finely-tuned standar[d]'"); *Cortez, supra*, at 417, 66 L Ed 2d 621, 101 S Ct 690 (the cause "sufficient to authorize police to stop a person" is an "elusive concept").  But we have deliberately avoided reducing it to "'a neat set of legal rules,'" *Ornelas, supra*, at 695-696, 134 L Ed 2d 911, 116 S Ct 1657 (quoting *Illinois v. Gates*, 462 US 213, 232, 76 L Ed 2d 527, 103 S Ct 2317 (1983)).  In *Sokolow*, for example, we rejected a holding by the Court of Appeals that distinguished between evidence of ongoing criminal behavior and probabilistic evidence because it "create[d] unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment."  490 US, at 7-8, 104 L Ed 2d 1, 109 S Ct 1581.

*Id.* at 273-274.  S*ee also United States v. Bayless*, 201 F.3d 116, 132-133 (2d Cir. 2000).

The police officers in this case were investigating a complaint in the early morning hours of August 28, 2010 of allegedly four males and the possibility of a gun in a vehicle which they occupied.  (Government Exhibits 1 and 2).  Lt. Mullen observed a vehicle matching the description in the complaint and observed a number of occupants in the vehicle as it was parked in front of 75 Poultney.  This certainly suggested a situation that was fraught with potential danger to the police officers and a very high violence potential.

> Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions.  Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry's* rule, which permits protective police searches on the basis of reasonable suspicion rather than demand that officers meet the higher standards of probable cause, responds to this very concern.  *See* 392 US, at 30, 20 L Ed 2d 889, 88 S Ct 1868.

*Florida v. J.L.*, 529 U.S. 266, 272 (2000).

The fact that Officer Fuller asked the defendant "if there was (sic) any drugs or weapons in the vehicle" is of no legal consequence under the circumstances of this case.

"The need for answers to questions in a situation posing a threat to the [officers'] safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self incrimination."  *New York v. Quarles*, 467 U.S. 649,

657 (1984).   This exception has been expressly recognized by the Court of Appeals for

the Second Circuit wherein the court ruled:

> In *New York v. Quarles*, the Supreme Court identified a
> "narrow exception to the Miranda rule," when arresting
> officers ask a defendant "questions necessary to secure
> their own safety or the safety of the public."   467 U.S. at
> 658-59, 104 S.Ct. 2626.   Recently reiterating this principle in
> *United States v. Reyes*, this court observed that "Miranda
> warnings need not precede 'questions reasonably prompted
> by a concern for the public safety' or for the safety of the
> arresting officers" for a suspect's answers to be admitted as
> evidence of his guilt.   353 F.3d at 152 (quoting *New York v.
> Quarles*, 467 U.S. at 656, 104 S.Ct. 2626).   The public
> safety exception to Miranda does not depend upon the
> subjective motivation of the questioning officer.   *See
> Quarles*, 467 U.S. at 655-56, 104 S.Ct. 2626.   Rather, it
> applies so long as the questioning "relate[s] to an objectively
> reasonable need to protect the police or the public from any
> immediate danger."   *Id*. at 659, n. 8, 104 S.Ct. 2626; accord
> *United States v. Reyes*, 353 F.3d at 154.

*United States v. Newton*, 369 F.3d 659, 677-78 (2d Cir. 2004).


        "A law enforcement agent, faced with the possibility of danger, has a right

to take reasonable steps to protect himself and an obligation to ensure the safety of

innocent bystanders, regardless of whether probable cause to arrest exists."   *United

States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990), *cert. denied*, 498 U.S. 1098

(1991); *see Terry*, 392 U.S. at 23-24 (recognizing "interest of the police officer in taking

steps to assure himself that the person with whom he is dealing is not armed with a

weapon that could unexpectedly and fatally be used against him.").   "The officer need

not be absolutely certain that the individual is armed; the issue is whether a reasonably

prudent man in the circumstances would be warranted in the belief that his safety or

that of others was in danger."  *Terry*, 392 U.S. at 27; *see also Sibron v. New York*, 392

U.S. 40, 64 (1968) ("In the case of the self-protective search for weapons, [a police

officer] must be able to point to particular facts from which he reasonably inferred that

the individual was armed and dangerous.").

> A limited search for weapons, without a warrant and without
> probable cause, is also permissible in connection with a
> lawful custodial interrogation that does not rise to the level of
> an arrest, *see, e.g.* (*Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct.
> 1868, 1879-80, 20 L. Ed. 2d 889 (1968) ("*Terry*"), on the
> rationale that "[i]f a suspect is 'dangerous,' he is no less
> dangerous simply because he is not arrested," Michigan v.
> Long, 463 U.S. 1032, 1050, 103 S. Ct. 3469, 3481, 77 L. Ed.
> 2d 1201(1983).  Further, the suspect need not actually be
> dangerous to validate such a limited purpose search, so long
> as the officer has a reasonable belief that the suspect poses
> a danger and may have a weapon within his reach.

*McCardle* v. *Haddad*, 131 F. 3d 43, 48 (2d Cir. 1997); *see also United States v. Harley*,

682 F.2d 398, 402 (2d Cir. 1982).


      Officer Fuller asked the defendant if "it would be all right (sic) if [they]

checked" the vehicle for weapons.  The defendant responded by stating that "it wasn't

his vehicle but he would have no problem" with such a search.  (T2, pp. 102, 116-117,

121) but indicated that the owner of the vehicle was the female driver who was his

girlfriend.  (T2, p. 121).  In his uncontradicted testimony, Officer Fuller stated that one of

the other responding police officers, who was questioning the female driver/owner of

the vehicle, indicated to him that she had given consent to search the vehicle. (T2, pp.

122-123).  Thereupon, the defendant was requested to exit the vehicle.  (T2, p. 123).

It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable. . . subject only to a few specifically established and well-delineated exceptions.' (citations omitted).  It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent (citations omitted).

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Matlock*, 415 U.S. 164 (1974).

This principle was reaffirmed by the United States Supreme Court in *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) wherein it stated:

The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects (citations omitted).  The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L.Ed.2d 854, 93 S. Ct. 2041 (1973), or from a third party who possesses common authority over the premises, *see United States v. Matlock, supra*, at 171, 39 L.Ed.2d 242, 94 S.Ct. 988.

In determining whether a consent to search is valid or not, the "totality of the circumstances must indicate that it was voluntarily given."  *United States v. Davis*, 967 F.2d 84, 86 (2d Cir.), *cert. denied by Content v. United States*, 506 U.S. 928 (1992), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249 (1973).  Stated another way, a determination must be made as to whether, under a totality of the circumstances, "the consent was a 'product of that individual's free and unconstrained choice, rather than a

mere acquiescence in a show of authority.'" *United States v. Garcia*, 56 F.3d 418, 422

(2d Cir. 1995) (internal citations omitted).   The burden of establishing the validity of the

consent to search is upon the government.  *Schneckloth v. Bustamonte, supra* at 222;

*Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *Florida v. Royer*, 460 U.S. 491,

497 (1983) (plurality opinion).  In meeting its burden of establishing that a consent to

search was validly given, the government need only show by a preponderance of the

evidence that the consenting party freely and voluntarily gave his consent to search.

*United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004); *United States v. Calvente*, 722

F.2d 1019 (2d Cir. 1983).  In this regard, the credibility of the witnesses is a question for

the judge who heard them.  *United States v. Miley*, 513 F.2d 1191, 1201 (2d Cir.), *cert.*

*denied*, 423 U.S. 842 (1975).  As previously indicated, the defense did not call any

witnesses, and I find the testimony of Police Officer Fuller to be credible on this issue of

consent as having been given by the driver/owner to his fellow officers at the scene and

that it was "objectively reasonable for the officer[s] to believe that the scope of the

[consenting party's] consent permitted [them] to [conduct the search that was

undertaken of the vehicle.

          Furthermore, the consent to search the vehicle given by the owner/driver

alone was sufficient to validate the action taken by the police in that regard.

> [W]hen the prosecution seeks to justify a warrantless search
> by proof of voluntary consent, it is not limited to proof that
> consent was given by the defendant, but may show that
> permission was obtained from a third party who possessed
> common authority over or other sufficient relationship to the
> premises or effects sought to be inspected.

*United States v. Matlock*, 415 U.S. 164, 171 (1974).


        The Court of Appeals for the Second Circuit has addressed the issue of

"authority" to give consent as follows:

> To satisfy the burden imposed on it by the third party
> consent principle, the government must show, by a
> preponderance of the evidence, that the consent to search
> was freely and voluntarily given, *see Schneckloth v.
> Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854
> (1973), and was obtained from someone "who possessed
> common authority over or other sufficient relationship to the
> premises or effects sought to be inspected."  *United States
> v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d
> 242 (1974).  Since third party consent does not involve the
> vicarious waiver of a defendant's constitutional rights, it
> validates a search only when a defendant can be said to
> have assumed the risk that someone having authority over
> the area to be searched would permit the governmental
> intrusion in his own right.

*United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981).


        The defendant indicated to Officer Fuller that his girlfriend seated in the

driver's seat of the vehicle was the owner of the vehicle.  It was reasonable for the

officers to assume that she had control over the vehicle as well as access to it as the

driver and, therefore, had authority to consent to a search of the vehicle.


        The fact that the defendant was requested by Officer Fuller to exit the

vehicle and was "pulled towards the back of the vehicle" (T2, p. 102) before the weapon

in question was observed, is of no legal consequence.  Officer Fuller and his fellow

officers had the right to direct all of the occupants of the vehicle  to exit it while they

-18-

conducted their investigation and such directive was not violative of the Fourth Amendment's proscription of unreasonable seizures.  *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977); *Maryland* v. *Wilson*, 579 U.S. 408, 415 (1997); *Molica* v. *Volker*, 229 F.3d 366, 369 (2d Cir. 2000).  *See Dempsey v. Town of Brighton,* 749 F. Supp. 1215 (W.D.N.Y. 1990) (officer's decision to stop vehicle containing individual who matched description of suspect in armed bank robbery and order occupants of the vehicle to crawl out of the vehicle and lay down on the grass, and to handcuff their wrists behind their back while conducting a pat down search, was reasonable), *aff'd* 940 F.2d 648 (2d Cir.) (unpublished table decision), *cert. denied*, 502 U.S. 925 (1991); *see also United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989) ("The amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight or drawing guns where law officers reasonably believe they are necessary for their protection."), *cert. denied* 494 U.S. 1008 and 494 U.S. 1069 (1990); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) ("requiring the suspect to lie down while a frisk is performed, if reasonably necessary, does not transform a Terry stop into an arrest.").

        The actions of Officer Fuller and the other police officers were reasonable in carrying out their investigation and protecting their safety and did not violate the defendant's Fourth Amendment "interest in remaining secure from intrusion."  *United States v. Hensley*, 469 U.S. 221, 226 (1985).

As soon as the defendant exited the vehicle, Officer Heitzhaus observed the weapon underneath the front seat of the vehicle.  (T1, pp. 56, 81, 130; T2, pp. 102-103).  As a result, the defendant was arrested, cuffed and placed in a patrol car.  (T2, pp. 102-103).

> It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.

*Harris v. United States*, 390 U.S. 234, 236 (1968).

The plain view exception to the Fourth Amendment warrant requirement "authorizes seizure of illegal or evidentiary items visible to a police officer whose access has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity."  *Illinois v. Andreas*, 463 U.S. 765, 771 (1983).   In accordance with this exception, the warrantless seizure of an item is justified where: (1) the police have lawful access to the place from which the item can be plainly viewed; (2) the item seized is in fact in plain view at the time it is discovered; and (3) it is immediately apparent to the police at the time of discovery that the item constitutes evidence of, an instrumentality of, or fruit of, a crime.  *Horton v. California*, 496 U.S. 128, 136 (1990); United States  v. Kiyuyung, 171 F.3d 78 (2d Cir.1999). To *meet* the "immediately apparent" standard, police officers must have probable cause to believe that an object in plain view is contraband without conducting some further search of the object.   *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

Since the officers had received consent to search the vehicle as previously indicted, they had lawful access to the interior of the vehicle.  The weapon was in "plain view" to Officer Heitzhaus at the time of its discovery and constituted contraband or "an instrumentality" of a crime and, therefore, subject to lawful seizure. (T2, p. 130)

The fact that the defendant was the passenger in the vehicle did not adversely affect the right of the police to arrest and charge him with a weapon's violation based on the observation and subsequent seizure of the weapon in and from the front seat area of the vehicle in which he was sitting.  In *Wyoming v. Houghton*, 526 U.S. 295 (1999), the Supreme Court noted that "a car passenger - unlike the unwitting tavern patron in *Ybana* - will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Id.* at 304-305; *Maryland v. Pringle*, 540 U.S.366 (2003).

In the *Pringle* case, which involved a driver and two passengers (Pringle was a passenger) in an automobile stopped by the police for speeding and the seizure of drugs and money from the vehicle resulting in charges against all three occupants of the vehicle, the Supreme Court addressed issues that are substantially similar to the case at hand in the context of whether there was probable cause to charge Pringle with possession of the contraband and reiterated the law in determining probable cause as follows:

A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause.  *United States v. Watson*, 423 U.S. 411, 424 (1976); see *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may without violating the Fourth Amendment, arrest the offender").

\*   \*   \*

On many occasions, we have reiterated that the probable-cause standard is a "practical, nontechnical conception" that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (quoting *Brinegar, supra*, at 175-176); *see, e.g., Ornelas v. United States*, 517 U.S. 690, 695 (1996); *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989).  "[P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules."  *Gates*, 462 U.S., at 232.

\*   \*   \*

To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause, *Ornelas, supra*, at 696.

\*   \*   \*

We think it an entirely reasonable inference from these facts that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine.  Thus a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly.

> Pringle's attempt to characterize this case as a guilt-by-association case is unavailing.  His reliance on *Ybarra v. Illinois, supra,* and *United States v. Di Re*, 332 U.S. 581 (1948), is misplaced.
>
> \*   \*   \*
>
> We hold that the officer had probable cause to believe that Pringle had committed the crime of possession of a controlled substance.  Pringle's arrest therefore did not contravene the Fourth and Fourteenth Amendments.

*Id.* at 370-372, 374.

Lt. Mullen and Officer Fuller testified that immediately after placing defendant under arrest, Lt. Mullen gave *Miranda* warnings to the defendant and that the defendant acknowledged that he understood his rights.  (T1, pp. 58-60; T2, pp. 94, 98-99, 103, 126-129).  After being so advised, the defendant was first questioned about the gun in the vehicle by Lt. Mullen and then questioned by Officer Fuller.  (T1, pp. 63-64; T2, pp. 99-100, 102-103) and the questions asked of the defendant and his responses to same were reduced to writing in a CPL 710.30 form (Government Exhibit 3).  The defendant seeks to have these responses suppressed as evidence at trial.

As previously indicated, the defendant did not present any witnesses or testimony at the evidentiary hearing conducted by this Court on April 26 and May 2, 2011.  The testimony of Lt. Mullen and Officer Fuller was uncontradicted on the issue of giving *Miranda* warnings and advice of rights to the defendant prior to interrogating him.  I observed the demeanor of both police officers and heard their testimony and have found them to be credible.  As a result, I find that the defendant was properly warned

and advised of his rights in accordance with the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966).

## **CONCLUSION**

Based on the foregoing, it is hereby recommended that the defendant's motion to suppress the evidence seized from the vehicle on August 28, 2010 and his statements as contained in Government Exhibit 3 be in all respects DENIED.

It is hereby  **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of**

**such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*,

474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir.

1988).


        The parties are reminded that, pursuant to Rule 58.2 of the Local Rules

for the Western District of New York, "written objections shall specifically identify the

portions of the proposed findings and recommendations to which objection is made and

the basis for such objection and shall be supported by legal authority." **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of**

**Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**


DATED:     Buffalo, New York
           April 13, 2012

                               *S/ H. Kenneth Schroeder, Jr.*
                               **H. KENNETH SCHROEDER, JR.**
                               **United States Magistrate Judge**